**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiffs and the putative*
*FLSA Collective*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **JIN KIM, DUSTIN CRABTREE and CLIFFORD MODESTE, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>-against-<br><br>**WELD POWER GENERATOR, INC., EDWARD GEARY, TIMOTHY GEARY and KEVIN GEARY, Jointly and Severally,**<br><br>**Defendants.** | **COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Jin Kim ("Kim"), Dustin Crabtree ("Crabtree") and Clifford Modeste ("Modeste" and, together with Kim and Crabtree, the "Plaintiffs"), individually and on behalf of all others similarly situated, as collective representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs are former service engineers and a service technician who worked for Defendants' generator contracting business performing maintenance, repair, servicing, testing and replacement duties on commercial generators and generator components and automatic transfer switches. Throughout their respective employment periods, Plaintiffs worked on public and private projects throughout New York, New Jersey and Pennsylvania. For their work, Plaintiffs were paid an hourly rate that did not include proper prevailing wages or supplemental benefits when they performed work on public projects. Further, Plaintiffs were often not paid wages of any kind for certain travel time, time spent speaking with customers and filling out mandatory paperwork and for lunch breaks that they were unable to take during the workday, resulting in significant unpaid regular and overtime wages.

2.     Plaintiffs bring this action to recover unpaid overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the New York Labor Law ("NYLL"), §§ 650 *et seq.*, and the New Jersey State Wage and Hour Law, N.J.S.A. § 34:11-56a4 *et seq.* ("NJWHL") and N.J.S.A. § 34:11-56a25 *et seq.*

3.     Plaintiffs seek to recover unpaid prevailing wages, daily overtime and supplemental benefits which they were entitled to receive for work they performed pursuant to contracts entered into between Defendants and New York state, city or local public entities, including but not limited to the New York City Housing Authority ("NYCHA"), the New York City Office of the Chief Medical Examiner ("NYC OCME"), Yonkers public schools, New York City Office of Emergency Management ("NYC OEM"), New York State Office of Mental Health ("NYS OMH") and the Metropolitan Transit Authority ("MTA"), among others, which required the payment of prevailing wages. Plaintiffs also seek to recover unpaid prevailing wages, daily overtime and supplemental

benefits for work performed on various public buildings throughout Hudson County, New Jersey, including but not limited to Hudson County Corrections Center ("HCCC"), Hudson County Administration Building ("HCAB") and Hudson County Office of Emergency Management ("HCOEM"), among others, under the New Jersey Prevailing Wage Act, N.J.S.A. § 34:11-56.25 *et seq.* ("NJPWA").

4.     Plaintiffs also bring claims for unpaid wages pursuant to NYLL §§ 190 & 193 and for Defendants' failure to provide proper wage statements pursuant to NYLL § 195(3).

5.     Plaintiffs bring their FLSA claim on behalf of themselves and all other similarly situated employees of Defendants. Plaintiffs bring their NYLL claims, New York common law claims, NJPWA claims and NJWHL claims on behalf of themselves and any individuals who exercise their right to join this action pursuant to § 216(b) of the FLSA (the "Opt-in Plaintiffs").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337 and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

9.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive

Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020.

## **THE PARTIES**

**Plaintiffs:**

11.    Plaintiff Kim was, at all relevant times, an adult individual residing in Queens County, New York.

12.    Plaintiff Crabtree was, at all relevant times, an adult individual residing in New Haven County, Connecticut and Litchfield County, Connecticut.

13.    Plaintiff Modeste was, at all relevant times, an adult individual residing in Queens County, New York.

14.    Throughout the relevant time period, Plaintiffs performed work for Defendants on

various job sites throughout New York and New Jersey, including in this District.

15.     Plaintiffs consent in writing to be parties to this action, pursuant to 29 U.S.C. § 216(b), and their consent forms are attached hereto.

**Defendants:**

16.     Defendant Weld Power Generator, Inc. ("Weld Power Generator" or the "Corporate Defendant") is an active New York corporation with its principal place of business located at 3927 Mulvey Avenue, Bronx, New York 10466.

17.     Upon information and belief, Defendants additionally own, operate and manage Weld Power Service Company, Inc. ("Weld Power Service"), a Massachusetts corporation with its principal place of business located at 1529 Grafton Road, Millbury, Massachusetts 01527. Upon information and belief, Weld Power Service is a parent company of Weld Power Generator and is similarly owned, operated and managed by Defendants Edward Geary ("E. Geary"), Timothy Geary ("T. Geary") and Kevin Geary ("K. Geary" and, together with E. Geary and T. Geary, the "Individual Defendants" and, collectively with Weld Power Generator, the "Defendants"). Upon information and belief, Weld Power Generator is the New York branch of Weld Power Service.

18.     Upon information and belief, Weld Power Generator does not maintain a formal billing department in its Bronx, New York location such that all billing, invoicing and payroll is conducted through Weld Power Service offices in Massachusetts.

19.     Throughout the relevant time period, Defendants sent certain of their Massachusetts-based engineers to perform service work in New York on an as-needed basis. Specifically, Plaintiff Crabtree recalls working alongside two (2) of Defendants' employees from Massachusetts on an MTA project located at 130 Livingston Street, Brooklyn, New York 11201.

20.     Upon information and belief, the Individual Defendants are owners and operators

of Weld Power Generator who set the company's payroll policies, including the unlawful practices complained of herein.

21.    Upon information and belief, throughout the relevant time period, the Individual Defendants were in charge of determining Weld Power Generator's policies with respect to payroll and otherwise running the business of Weld Power Generator.

22.    The Individual Defendants participated in the day-to-day operations of Weld Power Generator and acted intentionally in their direction and control of Plaintiffs and Weld Power Generator's other similarly situated employees and are each an "employer" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations thereunder, 29 C.F.R. § 791.2, as well as the NYLL § 2, NJWHL § 34:11-4.1 and the regulations thereunder, and are jointly and severally liable with the Corporate Defendant.

23.    In corporate filings with the New York State Department of State, Division of Corporations, Defendant E. Geary is listed as the Chief Executive Officer of Weld Power Generator. The address listed for E. Geary is 1529 Grafton Road, Millbury, Massachusetts 01527 (i.e., the principal place of business of Weld Power Service).

24.    In corporate filings with the Massachusetts Department of State, Corporations Division, Defendant E. Geary is listed as the Chief Executive Officer of Weld Power Service.

25.    In corporate filings with the Massachusetts Department of State, Corporations Division, Defendant T. Geary is listed as the president of Weld Power Service.

26.    Upon information and belief, Defendant T. Geary is the president of Weld Power Generator. Throughout the relevant time period, T. Geary was responsible for approving contracts entered into by Weld Power Generator, including contracts to perform work on public works projects, approving requests for spending and repairs above a certain dollar amount, making

decisions regarding employee pay and benefits and generally overseeing the business operations of Weld Power Generator. Plaintiffs additionally had meetings and conversations with T. Geary to discuss the status of various jobs on which they worked and address any questions that they had about particular customers.

27.     On several occasions, when Plaintiff Kim inquired with Weld Power Generator's service manager Tim Earnest ("Earnest") and Defendant K. Geary about getting a raise, Earnest and K. Geary explicitly informed Kim that T. Geary was the "final authority" regarding pay increases. Kim subsequently had conversations with T. Geary during which T. Geary ultimately authorized his final pay raise.

28.     Plaintiffs are aware that T. Geary signed the lease for Weld Power Generator's Bronx shop, located at 3927 Mulvey Avenue, Bronx, New York 10466 (hereinafter the "Weld Power Generator Shop").

29.     Upon information and belief, Defendant T. Geary is a son of Defendant E. Geary.

30.     Defendant K. Geary became a branch manager of Weld Power Generator starting in or around 2019 and served as a liaison between Defendants' Massachusetts and New York outfits. From that point forward, Plaintiffs observed K. Geary in the Weld Power Generator Shop on a daily basis. Plaintiffs had frequent discussions with K. Geary regarding the work that they had performed on a particular day and their plans for the following workday. Upon information and belief, K. Geary oversaw scheduling of Defendants' employees and occasionally complained to Plaintiffs that they did not stay on job sites long enough, despite explicit instructions from customers that Defendants' employees were only permitted on site during certain hours. K. Geary was in frequent communication with Plaintiffs to ensure that they had all necessary parts and equipment to perform their job duties and field questions about issues on particular job sites.

Plaintiffs additionally frequently overheard K. Geary communicating with Earnest and T. Geary by phone about the business operations of Weld Power Generator.

31.    Upon information and belief, K. Geary is a son of Defendant E. Geary and a brother of Defendant T. Geary.

32.    Although E. Geary and T. Geary primarily worked from Defendants' Massachusetts offices, Plaintiffs frequently overheard Defendant K. Geary and supervisor James Henry ("Henry") speaking on the phone with E. Geary and T. Geary about the business operations of Weld Power Generator. During these phone calls, E. Geary and T. Geary would often give direction to Henry and K. Geary to ensure that the work was being conducted pursuant to the terms of various contracts and Defendants' own policies and procedures. Plaintiffs are aware that Henry additionally had numerous in-person meetings throughout the year with Defendant E. Geary to discuss the business operations of Weld Power Generator.

33.    Defendant E. Geary came to New York approximately a couple of times per year to meet in person with Weld Power Generator customers.

34.    T. Geary visited Weld Power Generator's Bronx office approximately six (6) times per year to oversee operations, handle issues with Weld Power Generator customers and meet with Henry and Defendants' other managers and supervisors.

35.    At all relevant times, the Corporate Defendant has been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

36.    Upon information and belief, at all relevant times, the Corporate Defendant had gross revenues in excess of $500,000.00.

## FLSA COLLECTIVE ACTION ALLEGATIONS

37.     Pursuant to 29 U.S.C. §§ 207 & 216(b), Plaintiffs bring their First Cause of Action as a collective action under the FLSA on behalf of themselves and the following collective:

> All persons employed by Defendant Weld Power Generator, Inc. at any time from December 17, 2017 through the entry of judgment in this case (the "Collective Action Period") who worked as service engineers and service technicians (the "Collective Action Members").

38.     A collective action is appropriate in this circumstance because Plaintiffs and the Collective Action Members are similarly situated, in that they were all subjected to Defendants' illegal policy of failing to pay overtime premiums for all work performed in excess of forty (40) hours each week. As a result of this policy, Plaintiffs and the Collective Action Members did not receive overtime premium payments for all hours worked in excess of forty (40) hours per week.

39.     Plaintiffs and the Collective Action Members have substantially similar job duties and were paid pursuant to a similar, if not the same, payment structure.

## **STATEMENT OF FACTS**

**Defendants' Company**

40.     At all relevant times, Weld Power Generator has employed service engineers and service technicians in the generator and automatic transfer switch maintenance, repair, servicing and testing industry. Weld Power generator additionally rents and sells generators and automatic transfer switches.

41.     According to the website for Weld Power Generator:

> Our outfit is equipped to handle your business's back-up power equipment from maintenance to small necessary repairs all the way to an engine overhaul. We have a vast portfolio of work over the last 68 years ranging from radiator jobs, controller replacements, fuel systems to catalytic converter applications. Our service team is continuously equipped with the most up-to-date tools and training required to ensure that your mission-critical facility is in the most capable hands.

https://weldpower.com/generator-repair/

42.    Defendants' website additionally states:

Since 1952, Weld Power Generator has worked with commercial and government clients in need of emergency generator rental, preventative and emergency maintenance, and inspections of commercial generator units. Our technicians are available 24/7 to reduce the loss of data and funds in the case of an outage.

https://weldpower.com/generator-service-areas/

43.    Defendants' website further claims that "[w]e will continuously train and educate our factory-trained and EGSA certified technicians so as to be up to date on all new technologies and emerging products." *See* https://weldpower.com/about-weld-power-generator/. According to the website for the Electrical Generating Systems Association ("EGSA"), EGSA created an Electrical Generator Systems Technician Certification Program to "through rigorous testing…identify those technicians who not only have a broad knowledge of electricity, mechanical and electrical components and the interaction between them, but are proficient in the installation, service, maintenance and repair of On-Site Power generation systems." *See* http://www.egsa.org/EducationbrCertification/TechnicianCertification.aspx.  Upon  information and belief, all of Defendants' service engineers and service technicians must be EGSA certified.

44.    According to the website for Weld Power Generator, the company services a multitude of areas throughout Connecticut, Massachusetts, New Jersey, New York and Rhode Island. *See* https://weldpower.com/generator-service-areas/. The website states that Defendants' Millbury office is "conveniently located for customers in Eastern Massachusetts, Western Connecticut, and Rhode Island," while the Bronx office "allows us to quickly reach customers in New York, New Jersey, and Eastern Connecticut." *Id.*

45.    According to the public LinkedIn profile of Timothy Geary, Defendant T. Geary has served as president of "Weld Power Service Company" from April 2008 through the present. *See* https://www.linkedin.com/in/timothy-geary-aa175417.

46.     At all relevant times, the Individual Defendants have been in charge of the day-to-day operations of Weld Power Generator including, among other things, hiring, disciplining and firing employees, resolving complaints and conflicts, and setting the wage rates of employees.

47.     Upon information and belief, at all relevant times, the Individual Defendants handled the operations of Weld Power Generator's business and gave direction to the company's supervisors and managers, including Henry, to ensure that the work was being conducted in accordance with their policies and procedures, including the policies complained of herein.

**The Public Works Contracts**

48.     During the relevant time period, Weld Power Generator entered into certain contracts or agreements as either a subcontractor or prime contractor, with public agencies to provide generator and automatic transfer switch maintenance, servicing, repair and replacement work on governmental projects and at government-funded buildings within the State of New York and the State of New Jersey, including but not limited to New York City Housing Authority ("NYCHA"), the New York City Office of the Chief Medical Examiner ("NYC OCME"), Yonkers public schools, New York City Office of Emergency Management ("NYC OEM"), New York State Office of Mental Health ("NYS OMH"),  the Metropolitan Transit Authority ("MTA"), Hudson County Corrections Center ("HCCC"), Hudson County Administration Building ("HCAB") and Hudson County Office of Emergency Management ("HCOEM"), among others (the "Public Works Contracts").

49.     The Public Works Contracts obligated Defendants to pay Plaintiffs at or above the local prevailing wage rates, including any required supplemental benefits and overtime premiums for hours worked in excess of forty (40) hours per week, eight (8) hours per day, hours worked on Saturday and Sunday and hours worked during the evening.

11

50.     Defendants' failure to pay Plaintiffs proper prevailing wage rates, supplemental benefits and overtime premiums was a corporate policy that also applied to all of Defendants' other similarly situated employees.

51.     As employees of Defendants who were assigned to work on Defendants' generator and automatic transfer switch maintenance, repair, servicing and testing projects, Plaintiffs were intended third-party beneficiaries of Defendants' Public Works Contracts.

52.     As required by law, a schedule containing the prevailing rates of wages and supplemental benefits ("prevailing wage schedules") to be paid to Plaintiffs and Defendants' other employees should have been annexed to and formed a part of the Public Works Contracts. If not annexed to the Public Works Contracts, these schedules were expressly or impliedly incorporated into the contracts as a matter of law and/or public policy.

53.     The promise to pay and ensure payment of the prevailing wage and supplemental benefit rate stated in the Public Works Contracts was made for the benefit of all workers furnishing labor on the sites of the Public Works Projects and, as such, the workers furnishing the labor on the sites of the Public Works Projects, including Plaintiffs, are the beneficiaries of that promise and the contracts entered into between Defendants.

54.     In furtherance of the Public Works Contracts entered into by Defendants, Plaintiffs and Defendants' other employees performed various generator and automatic transfer switch servicing, maintenance, repair, testing and replacement services, including changing the oil or radiators in generator engines, cleaning generator components, replacing filters, repairing and replacing generator components, inspecting generators, performing generator and automatic transfer switch load bank tests, testing and repairing automatic transfer switches, maintaining generator cooling systems, installing rental generators, laying down cables for generators, taking

oil and coolant samples, tightening generator belts and rings, lubricating generator engines, repairing injectors and block heaters, replacing block heaters, hoses and deficient parts, inspecting, cleaning and replacing automatic transfer switch parts, removing and installing battery chargers, changing conduits and electrical connections, setting up industrial pumps and changing controllers and filter houses. Because every generator had a large industrial diesel engine, a substantial portion of Plaintiffs' job duties included mechanical engine and electrical work (e.g., making electrical connections and reconnecting feeder lines from the breaker). On certain job sites, including NYC OEM and Amtrak, Plaintiffs additionally were required to perform a "major overhaul" of the generator engine, which included replacing injectors and cylinder heads and performing heavy engine work.

### New York Prevailing Wage

55.    Employees performing inspection, testing, maintenance and repair work are properly classified as laborers, workmen and mechanics, pursuant to the New York State Department of Labor. Thus, Plaintiffs' work is covered under § 220 of the NYLL. Moreover, the Public Works Projects are carried out in buildings funded and controlled by New York City or New York State entities, including but not limited to New York City Housing Authority ("NYCHA"), the New York City Office of the Chief Medical Examiner ("NYC OCME"), the City of Yonkers, the Metropolitan Transit Authority ("MTA"), New York City Office of Emergency Management ("NYC OEM"), and New York State Office of Mental Health ("NYS OMH"), among others, and governed by contracts that their specifically or implicitly require payment of prevailing wages. In short, the law mandates that Defendants' public works contracts contain prevailing wage provisions. When parties enter into a contract, they are presumed or deemed to have contracted with reference to applicable existing laws.

56.    New York Labor Law explicitly provides that all construction contracts entered into by a public entity, including those for maintenance and repair of public buildings, shall contain a provision that each laborer, workman or mechanic employed by such contractor, subcontractor or other person about or upon such public work, shall be paid the wages therein provided.

57.    Upon information and belief, when Plaintiffs performed work on projects funded by public agencies of the City of New York, Plaintiffs should have been paid at the prevailing rate of wages (including supplemental benefits) of:

    a.    July 1, 2014 through June 30, 2015:  $42.10 plus $31.93 in supplemental benefits;[1]

    b.    July 1, 2015 through June 30, 2016:  $44.22 plus $34.25 in supplemental benefits;

    c.    July 1, 2016 through June 30, 2017: $45.28 plus $35.41 in supplemental benefits;

    d.    July 1, 2017 through June 30, 2018:  $45.28, plus $35.41 in supplemental benefits;

    e.    July 1, 2018 through June 30, 2019:  $47.25, plus $38.28 in supplemental benefits;

    f.    July 1, 2019 through June 30, 2020:  $48.26, plus $39.74 in supplemental benefits;

    g.    July 1, 2020 through June 30, 2021:  $48.26, plus $39.74 in supplemental benefits.

58.    Upon information and belief, when Plaintiffs performed work on projects funded

---

[1] The rates listed below are those of an "Engineer – Building Work Maintenance Engineers II" from the Office of the Comptroller, City of New York's § 220 Prevailing Wage Schedules.

by public agencies of the State of New York, Plaintiffs should have been paid at the prevailing rate of wages (including supplemental benefits) of an "Operating Engineer – Building, Maintenance, Steel Erection & Heavy Construction (Group 2: Maintenance of Pumps, Generators, Mixers, Heaters" or an "Operating Engineer – Building," pursuant to the New York State Department of Labor Prevailing Wage Schedules, depending on the specific job location to which they were assigned.[2]

**New Jersey Prevailing Wage**

59.     Upon information and belief, pursuant to New Jersey Statute §§ 34:11-56.27; 34:11-56.28, each of the Public Works Contracts for work to be performed in New Jersey contained a provision specifying the prevailing wage rate to be paid to all workmen on the Public Works Projects and mandating the payment of same to Plaintiffs.

60.     Pursuant to N.J. Stat. §§ 34:11-56.27; 34:11-56.28, the prevailing wage rate must be paid to all workmen on the projects, including Plaintiffs.

61.     The "prevailing rate of wage" is the rate of wage paid in the locality by virtue of collective bargaining agreements between bona fide labor organizations and employers of the private sector. See N.J. Stat. §§ 34:11-56.27; 34:11-56.28.

62.     Upon information and belief, Plaintiffs should have been paid at the prevailing rate of wages (including supplemental benefits) of "Operating Engineers," which title applies to "generator (2 or 3 battery)," from the New Jersey Department of Labor and Workforce Development Prevailing Wage Rate Determination for Hudson County, New Jersey:

        a. July 1, 2014 through June 30, 2015:  $42.57, plus $29.48 in supplemental benefits;

---

[2] The "Operating Engineer – Building, Maintenance, Steel Erection & Heavy Construction" rates are only available for work performed in Bronx, Kings, New York, Queens and Richmond Counties.

    b. July 1, 2015 through June 30, 2016:  $44.57, plus $30.63 in supplemental benefits;

    c. July 1, 2016 through June 30, 2017: $45.72, plus $30.63 in supplemental benefits;

    d. July 1, 2017 through June 30, 2018:  $47.07, plus $31.70 in supplemental benefits;

    e. July 1, 2018 through June 30, 2019:  $48.68, plus $32.85 in supplemental benefits;

    f. July 1, 2019 through June 30, 2020:  $49.63, plus $33.85 in supplemental benefits;

    g. July 1, 2020 through June 30, 2021:  $51.53, plus $34.50 in supplemental benefits.

**Plaintiffs' Work for Defendants**

63.    <u>Plaintiff Kim</u> worked for Defendants as a service engineer from in or around June 2018 through on or about September 11, 2020 (the "Kim Employment Period").

64.    Plaintiff Kim estimates that approximately eighty to ninety percent (80-90%) of the work that he performed for Defendants was on government-funded public works projects. Specifically, Plaintiff Kim recalls working on projects for the MTA (specifically, the NYCTA Rail Control Center located at 354 West 54th Street, New York, New York 10019, 130 Livingston Street, Brooklyn, New York 11201 and 46-45 Metropolitan Avenue, Queens, New York 11385), NYCHA (multiple housing developments, including Armstrong Houses in Brooklyn, 45 Allen Street in Manhattan, and Randall Avenue-Balcome Avenue in the Bronx), New York City Office of the Chief Medical Examiner ("NYC OCME"), which maintained offices in Manhattan, the

16

Bronx, Queens and Brooklyn), New York City Health & Hospitals Corporation ("NYC HHC"), Yonkers public schools, New York State Office of Mental Health (specifically, Pilgrim Psychiatric Center, located at 998 Crooked Hill Road, West Brentwood, New York 11717), New York City Office of Emergency Management ("NYC OEM") in Brooklyn, Department of Environmental Protection Wastewater Treatment Plant (specifically, Coney Island Wastewater Treatment Plant, located at 3002 Knapp Street, Brooklyn, New York 11235), City College of New York in the Bronx, Amtrak (New York Penn Station and multiple rail centers), New York City Economic Development Corporation (various ferry terminals, including East 34th Street Ferry Terminal, located at 501 East 34th Street, New York, New York 10016), SUNY Downstate, located at 710 Parkside Avenue, Brooklyn, New York 11226, and Westchester County Department of Emergency Services, located at 35 Walker Road, Valhalla, New York 10595. Plaintiff Kim additionally recalls performing work at a wastewater treatment facility in Rockland County, New York.

65.     For approximately the first six (6) months of the Kim Employment Period, approximately fifty percent (50%) of the work that Kim performed was pursuant to contracts entered into between Weld Power Generator and various public agencies of Hudson County, New Jersey. After the first six (6) months of his employment, Plaintiff Kim estimates that he spent approximately twenty-five percent (25%) of his time working performing work on Hudson County public projects. Specifically, Kim performed work at Hudson County Correctional Center, located at 30-35 Hackensack Avenue, Kearny, New Jersey 07032, Hudson County Administration Building, located at 595 Newark Avenue Jersey City, New Jersey 07306, and Hudson County Office of Emergency Management, located at 595 County Ave, Secaucus, New Jersey 07094.

66.     Upon information and belief, Weld Power Generator lost its contract(s) with Hudson County, New Jersey in or around 2020.

67.     At the start of the Kim Employment Period, Plaintiff Kim was paid approximately thirty-six dollars ($36.00) per hour. Starting in or around November 2018 through in or around October 2019, Plaintiff Kim was paid thirty-nine dollars and forty-three cents ($39.43) per hour. From in or around October 14, 2019 through in or around June or July 2020, Plaintiff Kim was paid forty-three dollars and fifty cents ($43.50) per hour. From in or around June or July 2020 through the end of the Kim Employment Period, Plaintiff Kim was paid approximately forty-four dollars and eighty-one cents ($44.81) per hour.

68.     Throughout the Kim Employment Period, Plaintiff Kim typically worked five (5) days per week, Monday through Friday. His hours typically varied, depending on the specific jobs to which he was assigned. Approximately eighty-five to ninety percent (85-90%) of the time, Plaintiff Kim started his workday at the Weld Power Generator Shop, where he typically arrived between 4:30 am and 7:00 am, depending on the location of his first job assignment. Per Defendants' company policy, Weld Power Generator employees are not compensated for the first hour of travel time from their homes to the first jobsite in the morning, nor are they compensated for the first hour of travel time from the final jobsite to home. Thus, if travel time would have amounted to over one (1) hour to the first job site, Plaintiff Kim was required to leave from his home. Depending on traffic and the location of his last job assignment, Plaintiff Kim typically arrived back at the Weld Power Generator Shop between 3:30 pm and 10:00 pm, and sometimes later.

69.     Throughout the Kim Employment Period, Plaintiff Kim typically worked approximately eight and one-half (8.5) hours per day on job sites, and sometimes more, for a total of approximately forty to forty-five (40-45) hours per week on the job sites, and sometimes more. On average, Plaintiff Kim estimates that he spent approximately ten to fifteen (10-15) hours per

week traveling from the Weld Power Generator Shop to the job sites and back, for a total of approximately fifty to fifty-five (50-55) hours of work per week.

70.    Throughout the Kim Employment Period, Plaintiff Kim typically worked a weekend day approximately three to four (3-4) times per year. He was generally paid one and one-half (1.5) times his regular hourly rate for hours worked on a Saturday.

71.    Throughout the Kim Employment Period, Plaintiff Kim was routinely required to work through lunch because he was unable to leave the government facility in which he was working. Despite the fact that he was unable to take a thirty (30)-minute uninterrupted lunch break during his workday, Weld Power Generator automatically deducted thirty (30) minutes from Kim's payment each day. Although Kim complained on several occasions to Defendant K. Geary and Earnest that he was not being paid for the thirty (30) minutes that he was unable to take a break, K. Geary and Earnest typically responded that Kim should "just take his lunch," as he was getting "docked" regardless of whether he was able to take a break.

72.    On approximately ten (10) occasions throughout the Kim Employment Period, Plaintiff Kim was not compensated for time spent traveling between the Weld Power Generator Shop and the job sites, despite the fact that it was Weld Power Generator's policy to compensate employees for this time. Similarly, although Weld Power Generator was obligated to pay for travel time in excess of one (1) hour when employees traveled between the job sites and their homes, Plaintiff Kim estimates that he was not paid for compensable drive time on approximately five (5) occasions. Although he complained to Defendant K. Geary that he was not paid for certain travel time, K. Geary simply responded that he would "get it worked out." Despite these assurances, Plaintiff Kim was never compensated for this time.

73.    Plaintiff Crabtree worked for Defendants as a service engineer from in or around

19

2011 through in or around February or March 2014 and again from in or around early May 2016 through on or about August 28, 2020 (collectively, the "Crabtree Employment Period").

74.     For approximately the first six (6) months of Crabtree's second period of employment with Defendants, Plaintiff Crabtree was paid approximately thirty-four dollars ($34.00) per hour. After approximately six (6) months into his second period of employment, Plaintiff Crabtree began receiving approximately thirty-seven dollars ($37.00) per hour. Plaintiff Crabtree estimates that he received a wage increase of approximately one dollar ($1.00) per hour, per year. At the time that Plaintiff Crabtree ceased working for Defendants, he was earning approximately forty dollars and twenty-one cents ($40.21) per hour.

75.     Throughout the Crabtree Employment Period, Plaintiff Crabtree performed work on numerous public projects throughout New York City and New York State, including but not limited to City College of New York, MTA Revenue Facility in Flushing, New York, an MTA site located at 130 Livingston Street, Brooklyn, New York 11201, Amtrak (New York Penn Station), NYCHA (Melrose in the Bronx, Berry Houses in Staten Island, Stuyvesant Gardens on Quincey Street in Brooklyn, 45 Allen Street in Manhattan and Randall Avenue-Balcome Avenue in the Bronx), NYC HHC, Yonkers public schools and Westchester County Department of Emergency Services, located at 35 Walker Road, Valhalla, New York 10595.

76.     Throughout the Crabtree Employment Period, Plaintiff Crabtree estimates that he spent approximately six to eight (6-8) weeks per year performing work on public projects throughout Hudson County, New Jersey, including Hudson County Correctional Center, located at 30-35 Hackensack Avenue, Kearny, New Jersey 07032, Hudson County Administration Building, located at 595 Newark Avenue Jersey City, New Jersey 07306, Hudson County Office of Emergency Management, located at 595 County Ave, Secaucus, New Jersey 07094 and a

psychiatric hospital, the name of which he cannot recall.

77.     Throughout the Crabtree Employment Period, Plaintiff Crabtree typically worked five (5) days per week, Monday through Friday. His hours typically varied, depending on the specific jobs to which he was assigned. Plaintiff Crabtree generally started his workday at the Weld Power Generator Shop approximately two to three (2-3) days per week, where he would arrive between 6:00 am and 7:00 am, and as early as 3:00 am, depending on the location of his first job assignment. Although his hours varied considerably day to day, on average, he typically arrived at his first job site between 6:30 am and 7:00 am and left from his last job site between 5:00 pm and 6:00 pm, and sometimes later. Plaintiff Crabtree, who resided in Connecticut throughout his employment with Defendants, typically did not return to the Weld Power Generator Shop at the end of his workday but performed any outstanding duties from the previous day, such as returning equipment, the following morning. On average, Plaintiff Crabtree worked approximately forty to sixty (40-60) hours per week on the job sites, and sometimes more.

78.     When Plaintiff Crabtree performed work on an MTA site located at 130 Livingston Street, Brooklyn, New York 11201 for approximately the last two (2) months of his employment with Defendants, he worked approximately fifteen (15) hours his first day and twelve (12) hours on his second day. Subsequently, Plaintiff Crabtree worked approximately ten (10) hours per day, five (5) days per week, for a total of approximately fifty (50) hours per week.

79.     Plaintiff Crabtree estimates that he typically worked approximately ten to twenty (10-20) weekend days per year. He was generally paid one and one-half (1.5) times his regular hourly rate for hours worked on a Saturday.

80.     Throughout the Crabtree Employment Period, Plaintiff Crabtree was routinely required to work through lunch, excepting approximately the last two (2) months of his

employment, when he performed work on an MTA site located at 130 Livingston Street in Brooklyn. Despite the fact that Crabtree was unable to take a thirty (30)-minute uninterrupted lunch break during his workday, Weld Power Generator automatically deducted thirty (30) minutes from Crabtree's payment each day. Although Crabtree complained to Earnest that he was not being paid for the thirty (30) minutes that he was unable to take a break, Earnest simply responded that he was "supposed to" take lunch.

81.    Plaintiff Modeste worked for Defendants as a service technician from in or around August 2018 through in or around June 2020 (the "Modeste Employment Period").

82.    Although Weld Power Generator classified Plaintiff Modeste was as a service technician, as opposed to a service engineer like Plaintiffs Kim and Crabtree, Plaintiff Modeste routinely performed the same tasks as Kim and Crabtree and was sent to work on the same job sites.

83.    At the start of the Modeste Employment Period, Plaintiff Modeste was paid approximately eighteen dollars ($18.00) per hour, which increased to approximately twenty-nine dollars and seventy-one cents ($29.71) per hour at the end of the Modeste Employment Period.

84.    Throughout the Modeste Employment Period, Plaintiff Modeste typically worked five (5) days per week, Monday through Friday. His hours varied, depending on the specific jobs to which he was assigned. Plaintiff Modeste generally started his workday at the Weld Power Generator Shop, where he typically arrived between 5:00 am and 7:00 am, depending on the location of his first job assignment. He typically arrived at his first job site between 8:00 am and 9:00 am, and sometimes earlier, depending on the particular job assignment, and arrived back at the Weld Power Generator Shop at the end of the day between 4:00 pm and 6:00 pm, and sometimes as late as 10:00 pm, depending on traffic and the location of the last job to which he

was assigned. On average, Plaintiff Modeste spent about forty to forty (40) hours per week working on job sites, and sometimes more, and ten to twenty (10-20) hours per week traveling between the Weld Power Generator Shop and the job sites, for a total of approximately fifty to sixty (50-60) hours of work per week.

85.    Plaintiff Modeste estimates that approximately fifty to sixty percent (50-60%) of the work that he performed for Defendants was on government-funded public works projects. Specifically, Plaintiff Modeste recalls working on projects for the MTA (specifically, NYCTA Rail Control Center located at 354 West 54th Street, New York, New York 10019 and MTA NYC Transit Consolidated Revenue Facilities in Brooklyn and Queens), Yonkers public schools, NYCHA (Berry Houses in Staten Island, Armstrong Houses in Brooklyn, Melrose in the Bronx and Sheepshead Bay in Brooklyn), City College of New York, Amtrak (a substation in the Bronx), NYC OEM in Brooklyn and Department of Environmental Protection Wastewater Treatment Plant (specifically, Coney Island Wastewater Treatment Plant, located at 3002 Knapp Street, Brooklyn, New York 11235).

86.    For approximately the first one and one-half (1.5) years of the Modeste Employment Period, Plaintiff Modeste performed work on public projects throughout Hudson County, New Jersey approximately twice per week, including Hudson County Correctional Center, located at 30-35 Hackensack Avenue, Kearny, New Jersey 07032, Hudson County Office of Emergency Management, located at 595 County Ave, Secaucus, New Jersey 07094, Hudson County Administration Building, located at 595 Newark Avenue Jersey City, New Jersey 07306 and a psychiatric hospital, the name of which he cannot recall. Plaintiff Modeste additionally recalls performing work at an Amtrak facility in New Jersey, although he cannot recall the precise location.

87.    Throughout the Modeste Employment Period, Plaintiff Modeste was required to work through lunch on a near daily basis. Despite the fact that Modeste was unable to take a thirty (30)-minute uninterrupted lunch break during his workday, Weld Power Generator automatically deducted thirty (30) minutes from Modeste's payment each day.

88.    Throughout their respective employment periods, Plaintiffs used a Paychex app to clock in and out. Plaintiffs clocked in either when they arrived at the Weld Power Generator Shop or, if it was going to take in excess of one (1) hour to travel to the job site, from home. Similarly, Plaintiffs clocked out either when they arrived back at the Weld Power Generator Shop or, if it was going to take in excess of one (1) hour to travel from the final job site, Plaintiffs clocked out when they arrived home. When Plaintiffs arrived at the Weld Power Generator Shop in the morning, they typically gathered necessary parts, filters, gaskets, oil, coolant, waste containment materials and spill containment rags before heading out to their first job site. At the end of the day, Plaintiffs often returned to the shop to unload hazardous waste at the back of their vehicle (i.e., gallons of waste oil and waste coolant) and occasionally get parts for the following day.

89.    Throughout their respective employment periods, Plaintiffs were required to complete certain paperwork, including job parts lists, quotes and various checklists and service reports using an Advanced Wireless Forms ("AW Forms") app. At times, Plaintiffs were also required to speak with customers after they were off-site to explain the status of the work they had performed on a particular site. Although Plaintiffs could spend between thirty (30) minutes and two (2) hours on these tasks, they were not compensated for this time. If Plaintiffs attempted to complete this paperwork on site, Earnest would frequently demand to know why they had stayed on site for so long and would advise them to complete their paperwork at home. On one occasion, when Plaintiff Kim asked Earnest if he could clock out at home after he finished his paperwork

and customer calls, Earnest replied that Defendants' employees would not be paid for time spent working at home and that they were supposed to clock out when they arrived back at their homes or the Weld Power Generator Shop.

90.     Throughout the relevant time period, a Weld Power Generator service coordinator, "Arelis," typically sent employee schedules, which Defendant T. Geary had reviewed, through an app called ESC Mobile Tech ("ESC"), which employees were able to access through their company iPads to view their job assignments for the following day.

91.     Throughout the relevant time period, Plaintiffs were paid via direct deposit on a weekly basis. However, Plaintiffs were able to view their paystubs on the Paychex website.

92.     Throughout the relevant time period, Plaintiffs and Defendants' other employees performed various generator and automatic transfer switch servicing, maintenance, repair and replacement services, including changing the oil or radiators in generator engines, cleaning generator components, replacing filters, repairing and replacing generator components, inspecting generators, performing generator and automatic transfer switch load bank tests, testing and repairing automatic transfer switches, maintaining generator cooling systems, installing rental generators, laying down cables for generators, taking oil and coolant samples, tightening generator belts and rings, lubricating generator engines, repairing injectors and block heaters, replacing block heaters, hoses and deficient parts, inspecting, cleaning and replacing automatic transfer switch parts, removing and installing battery chargers, changing conduits and electrical connections, setting up industrial pumps and changing controllers and filter houses. Because every generator had a large industrial diesel engine, a substantial portion of Plaintiffs' job duties included mechanical engine and electrical work (e.g., making electrical connections and reconnecting feeder lines from the breaker). On certain job sites, including NYC OEM and Amtrak, Plaintiffs

additionally were required to perform a "major overhaul" of the generator engine, which included replacing injectors and cylinder heads and performing heavy engine work.

93.    Throughout their respective employment periods, Plaintiffs frequently worked on platforms and metal dunnage around the equipment, such that they were effectively performing work on scaffolding.

94.    Throughout their respective employment periods, Plaintiffs worked with tools and equipment including ratchets, wrenches, voltmeters, filters, gaskets, pumps, refractometers and electric lifts.

95.    Plaintiffs were required to have an OSHA 10-hour certification card in order to perform work for Defendants and were routinely asked for their cards by on-site personnel at various facilities.

96.    Regardless of which job site they worked on, Plaintiffs' job duties on the site remained consistent.

97.    Because Plaintiffs' paystubs only accounted for time worked on job sites and did not include all compensable work time, including time worked during lunch breaks, certain travel time and time spent completing mandatory paperwork and responding to customer inquiries, the wage statements that Plaintiffs received did not show an accurate accounting of all hours that they had worked during the workweek.

98.    In addition to Plaintiffs' wages, Plaintiffs received certain benefits from Defendants, including medical, health, dental and pension benefits.

**Plaintiffs' Awareness of Their Entitlement to Prevailing Wages**

99.    Throughout their respective employment periods, Plaintiffs were paid the same rate on the Public Works Projects as they received for all other hours worked, despite the fact that they

were routinely informed that they were performing work on prevailing wage job sites.

100.    Throughout the relevant time period, Plaintiffs were paid overtime premiums only after forty (40) hours in a week, not eight (8) hours per day, as required by the applicable prevailing wage schedules.

101.    During Plaintiff Kim's first year of employment with Defendants, he observed signs at a wastewater treatment facility in Rockland County, New York stating that he was performing work on a prevailing wage site. Kim additionally observed similar signage posted on a board when he performed work at Hudson County Correctional Center. Plaintiff Modeste similarly recalled seeing prevailing wage notices at both a Department of Environmental Protection Wastewater Treatment Plant (specifically, Coney Island Wastewater Treatment Plant, located at 3002 Knapp Street, Brooklyn, New York 11235) and Pilgrim Psychiatric Center in Brentwood, New York.

102.    Plaintiff Kim recalls that at the DEP Coney Island site, there was a sheet of paper attached to the sign-in sheet that specifically stated that it was a prevailing wage site. The notice featured a QR code that linked to a website that similarly stated that the DEP was a public works project.

103.    Despite the fact that the DEP Coney Island site was clearly a public works projects that required the payment of prevailing wages, Defendant K. Geary instructed Kim to sign in as a "generator tech" instead of a service engineer. After several discussions with K. Geary during which Kim repeatedly explained that his job title was "service engineer," K. Geary eventually allowed Kim to sign in on the DEP site as a service engineer.

104.    When Plaintiffs performed work at NYC OCME in or around 2019, the pre-printed sign-in sheet that Plaintiffs were required to sign notably listed the "Engineer – Building Work

Maintenance Engineers II" classification from the Office of the Comptroller, City of New York's § 220 Prevailing Wage Schedules. Indeed, Plaintiffs were repeatedly told by on-site personnel that NYC OCME was a prevailing wage site and that Plaintiffs should sign in using the "Engineer – Building Work Maintenance Engineers II" classification. Despite this, Defendant K. Geary again instructed Plaintiffs on several occasions to cross out the pre-printed classification and sign in as "generator techs." When Plaintiffs followed K. Geary's directive and handwrote in the "generator tech" classification, NYC OCME personnel specifically informed them that the "Engineer – Building Work Maintenance Engineers II" was the rate that was specified pursuant to NYC OCME's contract with Weld Power Generator and that Weld Power Generator would not get paid for work that Plaintiffs performed unless they signed in under that classification. When Kim confronted K. Geary and Earnest, they replied by stating simply, "You work on generators don't you? So, you're a generator tech." Again, after Kim continued to question Weld Power Generator's position on this issue, K. Geary and T. Earnest eventually allowed him and Defendants' other employees working on the site to sign in using the "Engineer – Building Work Maintenance Engineers II" classification.

105.    A job dispatch (Dispatch No. 72697) issued to Kim for work to be completed for NYC EDC on the East 34th Street Ferry Terminal, located at 501 East 34th Street, New York, New York 10016, similarly directs Kim and presumably other service engineers and/or service technicians working on the site to sign in using an improper classification. In a section labeled "Customer Notes," the dispatch states: "Billing: IMPORTANT: When submitting bill to billing contact describe all work performed as services. (Example: Generator maintenance service, Load Bank service, etc.). Describing them all as services eliminates having to provide the paymaster for this job with certified payroll and prevailing wage information."

106.     Another job dispatch issued to Plaintiff Kim (Dispatch No. 71779) contains a contract number (OMH01-C200888-36500462), as well as a Prevailing Rate Case ("PRC") Number (2019008927) for certain work (i.e., "preventative maintenance for generators and ancillary equipment") performed at Pilgrim Psychiatric Center, located at 998 Crooked Hill Road, West Brentwood, New York 11717, for the New York State Office of Mental Health in or around early 2020. The dispatch specifically states "Prevailing Wage: $45.48" and provides the PRC Number for the contract. When the PRC Number is searched via the New York State Department of Labor website, the page specifically links to the July 2020 through June 2021 New York State construction prevailing wage schedule for Suffolk County, New York. The prevailing wage schedule includes a PDF entitled "Prevailing Wage Schedule for Article 8 Public Work Project," which includes a notice containing the following language:

> Attention Employees: This is a Public Work Project. If you are employed on this project as a worker, laborer, or mechanic, you are entitled to receive the prevailing wage and supplements rate for the classification at which you are working. These wages are set by law and must be posted at the work site.

The notice additionally states that "every worker shall be certified as having completed an OSHA 10 safety training course."

107.     The search results for the PRC Number associated with the Pilgrim Psychiatric Center project note that "Checked Occupation(s)" include "Construction (Building, Heavy & Highway, Sewer, Water, Tunnel)."

108.     Towards the end of the Crabtree Employment Period, Earnest and Defendant T. Geary informed Crabtree that they had a "prevailing wage job" (i.e., the 130 Livingston Street MTA project) for seventy (70) days and that Crabtree was entitled to earn approximately one hundred dollars ($100.00) per hour for the work that he performed on the project. However, for the duration of Crabtree's involvement in the project, he continued to receive his regular hourly

rate of forty dollars and twenty-one cents ($40.21). On one occasion, when Crabtree confronted Earnest about receiving the higher rate that the company had promised, Earnest responded that Weld Power Generator had not yet been paid on its invoices and that Crabtree would receive the prevailing wage rate differential once the company had been fully paid. Shortly after Crabtree ended his employment with Weld Power Generator, a six-hundred-dollar ($600) payment appeared in Crabtree's bank account from Weld Power Generator with no explanation of precisely what the money was for, much less, the precise time period it was meant to cover or the rate at which Crabtree was being compensated. Plaintiff Crabtree remains entitled to the differential between the applicable prevailing wage rate and his regular hourly rate for the duration of the time that he worked on the MTA project.

109.    Although Plaintiff Kim asked Earnest on several occasions whether he was entitled to prevailing wages and which contracts specifically required the payment of prevailing wages, Earnest repeatedly informed Kim simply that Weld Power Generator's lawyers were "looking into it."

## FIRST CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME
### (Brought on Behalf of Plaintiffs and the Collective Action Members)

110.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

111.    Defendants violated the FLSA overtime rights of Plaintiffs and the Collective Action Members by failing to pay overtime premiums of one and one-half (1.5) times the employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

112.    By failing to pay overtime at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

113.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

114.    Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
## NEW YORK LABOR LAW – UNPAID OVERTIME
### (Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)

115.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

116.    Defendants violated the NYLL overtime rights of the Plaintiffs and the Opt-in Plaintiffs by improperly treating them as exempt from the NYLL when they performed non-exempt duties and failing to pay overtime premiums consisting of one and one-half (1.5) times employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

117.    Defendants willfully violated Plaintiffs' and the Opt-in Plaintiffs' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of

pay for hours worked in excess of forty (40) each week, in violation of the NYLL and regulations promulgated thereunder.

118.    Defendants' failure to pay overtime premium compensation caused Plaintiffs and the Opt-in Plaintiffs to suffer loss of wages and interest thereon. Plaintiffs and the Opt-in Plaintiffs are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**THIRD CAUSE OF ACTION**
**<u>NEW JERSEY STATE WAGE AND HOUR LAW – UNPAID OVERTIME</u>**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

119.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

120.    Defendants willfully violated Plaintiffs' and the Opt-in Plaintiffs' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of pay for hours worked in excess of forty (40) each week, in violation of the NJWHL and the regulations promulgated thereunder.

121.    Defendants' failure to pay overtime premium compensation caused Plaintiffs and the Opt-in Plaintiffs to suffer loss of wages and interest thereon. Plaintiffs and the Opt-in Plaintiffs are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and distributions of the action pursuant to NJWHL §§ 34:11-56a4 *et seq.*

## FOURTH CAUSE OF ACTION
## NEW YORK LABOR LAW – WAGE STATEMENT VIOLATIONS
### (Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)

122.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

123.    Defendants have willfully failed to supply Plaintiffs and the Opt-in Plaintiffs a proper wage statement as required by Article 6, § 195(3).

124.    Due to Defendants' violations of the NYLL, Plaintiffs and the Opt-in Plaintiffs are entitled to recover from Defendants two hundred fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, or a total of five thousand dollars ($5,000) per employee, as provided for by NYLL §§ 198(1-d) liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

## FIFTH CAUSE OF ACTION
## NEW YORK LABOR LAW – FAILURE TO PAY WAGES
### (Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)

125.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

126.    Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiffs and the Opt-in Plaintiffs are entitled to be paid all their weekly wages "not later than seven calendar days after the end of the week in which wages are earned." Thus, Defendants violated NYLL § 191 by failing to pay Plaintiffs and the Opt-in Plaintiffs all of their wages earned within the week such wages were due.

127.    Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employee," such as Plaintiffs and the Opt-in Plaintiffs, that is not otherwise authorized by law or by the employee.

128.    By withholding wages and overtime compensation from Plaintiffs and the Opt-in Plaintiffs, pursuant to NYLL § 193 and the cases interpreting same, Defendants made unlawful deductions in wages owed to Plaintiffs and the Opt-in Plaintiffs.

129.    Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs wages of any kind for certain time worked when Plaintiffs and the Opt-in Plaintiffs were unable to take a lunch break, certain travel time and time spent completing mandatory paperwork and responding to customer inquiries violated NYLL §§ 191 and 193.

130.    Defendants' failure to comply with NYLL §§ 191 and 193 caused Plaintiffs and the Opt-in Plaintiffs to suffer loss of wages and interest thereon. Plaintiffs and the Opt-in Plaintiffs are entitled to recover from Defendants their unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

131.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

132.    Upon information and belief, the Public Works Contracts entered into by Defendants contained schedules of the prevailing rates of wages and supplemental benefits or reference to the NYLL provisions governing payment of prevailing wages to be paid to Plaintiffs

and the employees performing work pursuant to such contracts, including the Opt-in Plaintiffs.

133.    Those prevailing rates of wages and supplemental benefits were made part of the Public Works Contracts for the benefit of the Plaintiffs and the other employees performing work pursuant to such contracts. In the event that the contracts or agreements entered into failed to explicitly contain prevailing wage schedules, the prevailing wage requirements were supplemented as a matter of law, requiring Defendants to pay the Plaintiffs and the Opt-in Plaintiffs prevailing wages, daily/weekly overtime and supplemental benefits for all work performed.

134.    Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at the correct prevailing wage rates for straight time, overtime, and supplemental benefits for work performed on Public Works Projects constituted a material breach of the contracts entered into directly or indirectly between Defendants and certain public entities.

135.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at prevailing wage rates, they are entitled to relief from Defendants for breach of contract under New York common law of contracts.

**SEVENTH CAUSE OF ACTION**
**<u>NEW JERSEY PREVAILING WAGE ACT – UNPAID PREVAILING WAGE</u>**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

136.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

137.    New Jersey Statute 34:11-56:40 provides that "if any workman is paid less than the prevailing wage to which such workman is entitled under the provision of this act such workman may recover in a civil action the full amount of such prevailing wage less any amount actually paid to him or her by the employer, together with costs and such reasonable attorney's fees."

138.    Defendants willfully failed to pay Plaintiffs and the Opt-in Plaintiffs the Prevailing Wage and supplemental benefits for Workmen on State funded projects in violation of the New Jersey Prevailing Wage Act.

139.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at prevailing wage rates, they are entitled to relief from Defendants for unpaid wages pursuant to the New Jersey Prevailing Wage Act.

**EIGHTH CAUSE OF ACTION**
**VIOLATION OF N.J.S.T. 2A:44-148**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

140.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

141.    Defendants willfully failed to pay Plaintiffs and the Opt-in Plaintiffs the Prevailing Wage and supplemental benefits for Workmen on State funded projects in violation of the New Jersey Prevailing Wage Act.

142.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at prevailing wage rates, they are entitled to relief from Defendants for unpaid wages pursuant to the New Jersey Prevailing Wage Act.

**NINTH CAUSE OF ACTION**
**NEW JERSEY COMMON LAW – BREACH OF FIDUCIARY DUTY**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

143.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

144.    New Jersey law imposes a trust on all monies paid to contractors for the benefit of workers and materialmen who provide labor and materials on construction projects.

145.    Consequently, the Defendants, individually and jointly, have a fiduciary responsibility to Plaintiffs and the Opt-in Plaintiffs to ensure the payment of prevailing wages to the Plaintiffs and the Opt-in Plaintiffs.

146.    On information and belief, the Defendants have diverted the monies received from the State of New Jersey, the public utility, or other government entity and allocated such funds for improper purposes or purposes other than the payment of wages due the Plaintiffs and the Opt-in Plaintiffs.

147.    By reason of these willful violations, the Defendants are individually and jointly liable to Plaintiffs and the Opt-in Plaintiffs for an amount to be determined at trial, plus costs, fees and interest.

**TENTH CAUSE OF ACTION**
**NEW JERSEY COMMON LAW – BREACH OF CONTRACT (Pled in the Alternative)**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

148.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

149.    Upon information and belief, the Public Works Contracts entered into by Defendants contained schedules of the prevailing rates of wages and fringe benefits promulgated by the New Jersey Commissioner of Labor or other controlling governmental agencies, entities, or authorities to be paid to Plaintiffs and the employees performing work pursuant to such contracts pursuant to the NJWHL §§ 34:11-56.

150.    Those prevailing rates of wages and supplemental benefits were made part of the Public Works Contracts for the benefit of the Plaintiffs and the other employees performing work pursuant to such contracts. In the event that the contracts or agreements entered into failed to explicitly contain prevailing wage schedules, the prevailing wage requirements were supplemented as a matter of law, requiring Defendants to pay the Plaintiffs prevailing wages, daily/weekly overtime and supplemental benefits for all work performed.

151.    Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at the correct prevailing wage rates for straight time, overtime, and supplemental benefits for work performed on Public Works Projects constituted a material breach of the contracts entered into directly or indirectly between Defendants and certain public entities.

152.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at prevailing wage rates, they are entitled to relief from Defendants for unpaid wages pursuant to the New Jersey Common Law.

**ELEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT & QUANTUM MERUIT**
**(Pled In The Alternative)**
**(Brought on Behalf of Plaintiffs and the Opt-in Plaintiffs)**

153.    Plaintiffs, on behalf of themselves and the Opt-in Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

154.    Based on Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs the appropriate prevailing wage rates, Defendants were unjustly enriched at the expense of Plaintiffs and the Opt-in Plaintiffs.

155.    Equity and good conscience require that Defendants pay restitution to Plaintiffs and the Opt-in Plaintiffs.

156.    Upon information and belief, when Defendants entered into the contract, they agreed to pay the required prevailing wages, overtime, shift-differential and holiday premiums, and supplemental benefit rates of pay to Plaintiffs and the Opt-in Plaintiffs who performed work pursuant to the contracts.

157.    Plaintiffs and the Opt-in Plaintiffs provided valuable services to Defendants performing prevailing wage jobs for which Plaintiffs and the Opt-in Plaintiffs expected compensation. Defendants knowingly accepted such services yet failed to pay Plaintiffs the reasonable value of such services as defined by the New York State and New York City prevailing wage schedules.

158.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs at prevailing wage rates on prevailing wage jobs and Defendants' corresponding unjust enrichment, Plaintiffs and the Opt-in Plaintiffs are entitled to relief from Defendants under New York's common law of unjust enrichment.

159.    As a result of Defendants' failure to pay Plaintiffs and the Opt-in Plaintiffs the reasonable value of the valuable services they rendered, Plaintiffs and the Opt-in Plaintiffs are entitled to relief from Defendants under New York's common law of quantum meruit.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members, respectfully request that this Court grant the following relief:

a.    Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action

by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members;

b.    An order tolling the statute of limitations;

c.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL, New York Common Law, NJWHL and NJPWA;

d.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

e.    An award of compensatory damages as a result of Defendants' failure to pay overtime compensation pursuant to the FLSA, NYLL, NJWHL and supporting regulations;

f.    An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay overtime compensation pursuant to the FLSA, NYLL, NJWHL and supporting regulations;

g.    An award of compensatory damages as a result of Defendants' failure to pay all wages to which Plaintiffs are entitled, pursuant to the NYLL and supporting regulations;

h.    An award of liquidated and/or punitive damages as a result of Defendants' failure to pay all wages to which Plaintiffs are entitled, pursuant to the NYLL and supporting regulations;

i.    An award of two hundred fifty dollars ($250.00) per Plaintiff for each day that the violations of NYLL, Article 6 § 195(3), pertaining to distribution of wage

40

statements, occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per Plaintiff as provided for by NYLL, Article 6 § 198(1-d);

j.    An award of monetary damages to be proven at trial for all unpaid prevailing wages, daily/weekly overtime and supplemental benefits owed to Plaintiffs;

k.    An award of prejudgment and post-judgment interest;

l.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

m.    Such other and further relief as this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.


Dated: New York, New York
       December 17, 2020

                          Respectfully submitted,

                          **PELTON GRAHAM LLC**

                          By: _____

                          Brent E. Pelton
                          pelton@peltongraham.com
                          Taylor B. Graham
                          graham@peltongraham.com
                          Kristen E. Boysen
                          boysen@peltongraham.com
                          111 Broadway, Suite 1503
                          New York, New York 10006
                          Telephone: (212) 385-9700
                          Facsimile: (212) 385-0800

                          *Attorneys for Plaintiffs and the putative FLSA Collective*

41

**Notice of Shareholder Liability for Services Rendered
Pursuant to § 630 of the Business Corporation Law of New York**

Pursuant to the provisions of § 630 of the Business Corporation Law of New York ("NYBCL"), the ten (10) largest shareholders of WELD POWER GENERATOR, INC. are hereby notified that the plaintiffs in this matter, individually and on behalf of the putative FLSA collective they seek to represent, intend to enforce your personal liability, as the ten (10) largest shareholders of WELD POWER GENERATOR, INC., and to charge you with indebtedness of said corporations to the plaintiffs for services performed for the corporations as employees during the six (6)-year period preceding the filing of the complaint.

Services for the above-referenced corporation were terminated by plaintiffs within the past 180 days.

Dated: December 17, 2020

                */s/ Brent E. Pelton*
                Brent E. Pelton, Esq.

                *Attorneys for Plaintiffs and the putative*
                *FLSA Collective*

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Weld Power Generator and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

264E87654AC7428
_____
Signature

_____
Printed Name

Jin Kim

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Weld Power Generator and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

_____
D83D482E44C0464...
Signature

Dustin Crabtree

_____
Printed Name

DocuSign Envelope ID: 12A3D21C-931F-488A-9B18-EDBF486B49B7

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Weld Power Generator and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

*CLIFFORD MODESTE*

5CCE51F67B024DA...

_____
Signature

CLIFFORD MODESTE

_____
Printed Name