# PELTON GRAHAM LLC

111 BROADWAY, SUITE 1503, NEW YORK, NEW YORK 10006
T 212.385.9700 ‖ F 212.385.0800 ‖ WWW.PELTONGRAHAM.COM

**BRENT E. PELTON, ESQ.**  JUNE 23, 2022
PELTON@PELTONGRAHAM.COM

**VIA ECF**

Honorable Stewart D. Aaron
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

> RE: *Kim, et al. v. Weld Power Generator, Inc. et al.*
> <u>Civil Action No. 20 Civ. 10669 (SDA)</u>

Dear Judge Aaron:

    This office represents named plaintiffs Jin Kim, Dustin Crabtree and Clifford Modeste (collectively, the "Named Plaintiffs"). We write, jointly with Jerrold Goldberg, Esq., of Greenberg Traurig, LLP, counsel for Weld Power Generator, Inc. ("Weld Power"), Edward Geary ("E. Geary"), Timothy Geary ("T. Geary") and Kevin Geary ("K. Geary" and, together with Weld Power. E. Geary and T. Geary, the "Defendants"), pursuant to the Fair Labor Standards Act ("FLSA"), the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015) and the Court's June 15, 2022 Order (Dkt. No. 51). Counsel for the parties respectfully submit that the attached negotiated Settlement Agreement (Exhibit A) constitutes a fair and reasonable compromise of the parties' *bona fide* dispute which should be approved by the Court.

### I.   Procedural History and Plaintiffs' Allegations

    The Named Plaintiffs commenced this action by filing their Collective Action Complaint on December 17, 2020. (Dkt. No. 1). Defendants deny any violations of the wage laws occurred at any time. (Dkt. No. 16). On March 30, 2022, the Court referred the case to the SDNY Mediation Office for settlement purposes, as part of the Court's pilot program for cases involving FLSA claims. (Dkt. No. 17). The parties appeared before Your Honor for an initial conference on April 20, 2021, during which the parties set the schedule for the case. (Dkt. No. 23).

    Prior to reaching a settlement, the parties participated in three (3) mediation sessions with Richard G. Leland, Esq. of the SDNY Mediation Program, which took place on July 14, 2021, December 2, 2021 and January 26, 2022, respectively. While the sessions did not result in a resolution, the mediations provided a stable foundation for the parties' eventual settlement, which

was reached after several months of continued negotiations. In anticipation of the mediation sessions, Defendants produced substantial documentation, including paystubs, employee earnings records, certified payroll records, sales reports, e-mail correspondence, sign-in sheets, service call/repair reports, a summary of employer paid benefits, lists of public and private contracts, a spreadsheet showing a summary of hours worked per year for each customer for which Plaintiffs performed work on public jobs, and a spreadsheet of GPS records for the three (3) Named Plaintiffs. With respect to Plaintiffs' FLSA claims, Defendants additionally produced certain e-mails in which Plaintiffs provided their clock in or clock out times to various Weld Power employees when requested or to ensure that they were credited for the proper number of hours and/or specified that they had not taken lunch during certain shifts, as well a message to Plaintiff Crabtree from Weld Power service manager Tim Earnest informing Crabtree that he is only authorized to work through lunch on certain limited occasions. The Named Plaintiffs produced approximately three hundred and fifty (350) pages of documents, including job dispatches, sign-in sheets and paystubs.

After months of extensive post-mediation settlement discussions, the parties filed a letter on April 18, 2022 informing the Court that the parties had reached an amicable resolution of all claims and requesting guidance on how to most appropriately proceed with finalizing the settlement. (Dkt. No. 43). Specifically, as this case involves a significant non-FLSA claim (i.e., unpaid prevailing wages claimed to be owed for work performed pursuant to contracts allegedly requiring such wages) and an unpaid overtime claim brought under the FLSA and similar state wage and hour laws for hours allegedly worked but not compensated, the parties participated in a telephonic conference before Your Honor on May 9, 2022 during which they sought the Court's opinion regarding the possibility of proceeding with two settlement agreements (i.e., an FLSA agreement covering the unpaid wages and overtime claims to be submitted to the Court for approval and a non-FLSA agreement covering Plaintiffs' prevailing wage claims which the parties wish to keep confidential). As the Court expressed agnosticism with respect to the two (2)-agreement framework, provided that the publicly filed FLSA agreement did not contain provisions that would normally be rejected per *Cheeks*, the parties have prepared and executed two (2) separate agreements as described.

**II.    The Settlement Accounts for Litigation Risk**

Throughout this litigation, the parties have held different viewpoints on the underlying facts of this matter and Defendants' potential liability. Plaintiffs allege that they are former service engineers and a service technician who performed maintenance, repair, servicing and replacement duties on commercial generators and generator components and automatic transfer switches for Defendants' generator contracting business. Throughout their respective employment periods, Plaintiffs worked on public and private projects throughout New York, New Jersey and Pennsylvania. Plaintiffs allege that they spent significant time performing work pursuant to various public contracts, including MTA, NYCHA, NYC Office of Emergency Management, NYC Office of Mental Health (Pilgrim Psychiatric Center) and Yonkers public schools. For their work, Plaintiffs Kim and Crabtree, who worked as service engineers, were paid between approximately $34.00 per hour and $44.81 per hour during the relevant time period. Plaintiff Modeste, who worked as a service technician, was paid between $18.54 and $29.71 during his employment period with Defendants. Throughout this litigation, Plaintiffs have argued that they were third-party

beneficiaries of contracts between Weld Power and certain government agencies that required the payment of prevailing wages. Weld Power has vigorously disputed the number of hours Plaintiffs performed work on public projects, as well as their entitlement to prevailing wage payments. As the parties disclosed to the Court, Plaintiffs' breach of contract claim for unpaid prevailing wages was resolved in a separate confidential non-FLSA settlement agreement that has not been submitted for Court approval because it can be argued that the non-FLSA agreement does not conflict with the FLSA and the Second Circuit's precedent in *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199 (2d Cir. 2015, in terms of content and claims covered.

Plaintiffs additionally allege that they were often not paid wages of any kind for time spent speaking with customers and filling out mandatory paperwork and for lunch breaks that they claim they were unable to take during the workday, resulting in unpaid regular and overtime wages. Specifically, Plaintiffs allege that throughout their respective employment periods with Defendants, Plaintiffs were routinely required to work through their lunch break because they were unable to leave the government facility in which they were working. Plaintiffs further allege that Weld Power automatically deducted thirty (30) minutes from their time records each day regardless of whether they were able to take a break. Although Defendants produced certain records showing that Plaintiffs were able to take lunch breaks at a nearby restaurant on certain occasions, Plaintiffs claim that this was an unusual occurrence and that they were informed by certain Weld Power employees that their pay was being docked regardless of whether they were able to take breaks.

Plaintiffs additionally allege that they were required to complete certain paperwork, including job parts lists, quotes and various checklists and service reports using an Advanced Wireless Forms ("AW Forms") app. They further claim that at times, they were required to speak with customers after they were off-site to explain the status of the work they had performed on a particular site. Plaintiffs allege that although they could spend between thirty (30) minutes and two (2) hours on these tasks, they were not compensated for this time.

Defendants deny any violations of the wage laws occurred at any time. Defendants vehemently argue that Weld Power kept extremely detailed records of lunch/meal breaks and completion of paperwork and customer inquiries. Specifically, Defendants allege that there was GPS on every work truck, such that Weld Power would know when employees went to lunch. Indeed, Defendants produced certain records showing that Plaintiff Kim was able to go to lunch at TGI Friday's on multiple occasions. Defendants argue that lunch periods were paid if no work was performed and that Weld Power employees were paid for lunch breaks they were unable to take if they made the company aware. Defendants additionally argue that paperwork, which included customer issues and photographs, was never prepared outside of working time but was completed at the jobsite at the end of the day's work. Defendants claim that they have no e-mails, texts, memos, iPad input or any other document which would support Plaintiffs' claims that they performed work at home and note that although Plaintiff Kim in particular claims that he routinely had calls with customers after hours, neither he nor his co-plaintiffs produced any documentary evidence to support their claims. Plaintiffs allege that extracting information regarding customer calls would require hours of searches that would be difficult to perform without client contact information from Weld Power.

Although it is Plaintiffs' position that they worked considerable off-the-clock time for which they were not compensated, Plaintiffs recognize the fact that Weld Power maintains certain GPS

records and e-mail correspondence, as well as the lack of records reflecting after hours customer calls, provide a significant obstacle to succeeding on certain of their claims and could potentially limit the amount of damages, if any, that Plaintiffs could recover at trial if a factfinder credited Defendants' testimony in its entirety. Due to the fact-intensive nature of these inquiries, it is likely that substantive answers to these disputed issues would not be resolved until after significant document and deposition discovery, including analysis by a forensic specialist to match calls to or from Plaintiffs to numbers of Weld Power's customers, and motion practice, if not a trial. Based on these disputes, the parties engaged in good-faith, arm's-length settlement negotiations regarding Plaintiffs' FLSA claims.

In advance of the July 14, 2021 mediation, Plaintiffs' counsel created an individual damages analysis based on Plaintiffs' best estimates of unpaid hours for which they claim they were not compensated. Plaintiffs' total FLSA "actual" damages amounted to $71,401.89 in unpaid overtime premiums. It is Defendants' position that Plaintiffs' claim that they performed after-hours work at home is baseless. In light of the significant litigation risks outlined above, including the risk that Plaintiffs could ultimately end up with significantly less damages, if any, in light of Weld Power's records and testimony, the parties believe that the settlement amount (i.e., $11,000.00) is a fair recovery for Plaintiffs' FLSA claims.

The parties believe this is a fair recovery based on the risks associated with establishing the calculated damages and the risks associated with proceeding to trial. Settlement allows both the Named Plaintiffs and Defendants to avoid the burdens and expenses associated with establishing their respective claims and defenses. Indeed, through this settlement Plaintiffs achieve immediate payment and avoid the pressure and hassle of written discovery, depositions, forensic analyses, etc. Likewise, Defendants spare their business the disruption caused by litigation and the attorneys' fees and costs necessary to litigate the defenses raised herein. Although there is a possibility that Plaintiffs could recover higher damages if the case proceeded to trial, there is also the possibility that they could receive much lower damages, or nothing at all. As such, Plaintiffs prefer to settle now, on an individual basis, for an amount that they would be guaranteed to receive under the terms of the settlement.

### III. Settlement Terms

As set forth in the attached Settlement Agreement, the parties have agreed to settle Plaintiffs' FLSA claims for a total settlement amount of $11,000.00 (the "Settlement Amount"). Of that amount, $3,666.67 is payable to Plaintiffs' counsel. The remaining $7,333.33 is payable directly to Plaintiffs (the "Net Settlement Amount").

Keeping in line with the trend in this Circuit following *Cheeks*, the parties have agreed to a wage-and-hour release for any claims arising before Plaintiffs signed the Settlement Agreement. The parties also did not include a confidentiality provision.

### IV. Plaintiffs' Attorney's Fees and Expenses

As set forth in the attached Affidavit of Brent E. Pelton, Esq. (Exhibit B), as of June 23, 2022, Plaintiffs' counsel has spent more than 92 hours in prosecuting and settling this matter, resulting in a lodestar of $28,739.96. Plaintiffs' counsel has spent $400.00 in actual litigation costs. The portion of the settlement amount that Plaintiffs seek as attorneys' fees (i.e., $3,666.67) represents one-third (1/3) of the settlement amount, which is well below the lodestar and is consistent with what was agreed upon between the Plaintiffs and their counsel in their retainer agreements. The retainer agreements between Plaintiffs and their counsel set forth a contingency fee of one-third (1/3) of any settlement.

The hourly billing rates utilized by Plaintiffs' counsel in calculating the lodestar are within the range paid to attorneys of similar experience and professional focus in the Southern District of New York. In fact, the same rates have been approved in connection with a recent wage and hour default judgment in the Southern District. *See*, *e.g.*, *Campos v. BKUK 3 Corp.*, No. 18-cv-4036, Dkt. No. 156 (Aug. 10, 2021) (discussing and approving Pelton Graham's attorney and paralegal rates). Similar rates are within the range paid to attorneys of similar experience and professional focus in the Southern Districts of New York, including in FLSA/NYLL actions. *See*, *e.g.*, *Guallpa v. NY Pro Signs, Inc.*, No. 11-cv-3133, 2014 U.S. Dist. LEXIS 77033, at *27-*29 (S.D.N.Y. May 27, 2014) (awarding $300-$600 per hour for experienced FLSA attorneys); *Viafara v. MCIZ Corp.*, No. 12-cv-7452, 2014 U.S. Dist. LEXIS 60695, at *39-*41 (S.D.N.Y. Apr. 30, 2014) (finding reasonable hourly rates of $550 for senior partner and $350 for attorney identified as "counsel"). Accordingly, Plaintiffs' counsel submits that the attorneys' fees component of the settlement are fair and reasonable.

For the purposes of this settlement, Defendants take no position with respect to counsel's request for attorneys' fees and leave to the Court's determination provided that such attorneys' fees and costs are solely paid out of the Settlement Amount in accordance with the Settlement Agreement.

## V.   The Parties Believe that the Settlement Is Fair and Reasonable

An FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Cheeks*, *supra*; *Wolinsky v. Scholastic, Inc*. 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).[1] Generally, there is a "strong presumption in favor of finding a settlement fair," as "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Crabtree v. Volkert, Inc.*, No. 11-cv-0529, 2013 U.S. Dist. LEXIS 20543, at *8 (S.D. Ala. Feb. 14, 2013). Moreover, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig.*, No. 10-cv-1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is an adequate indicator of fairness of

---

[1] The parties note that *Cheeks* relies heavily on the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982), and that the Eleventh Circuit itself has subsequently contemplated that the supervision doctrine laid out in that case may apply only where a "compromise" of an FLSA claim has occurred. *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009).

settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07-cv-86, 2008 U.S. Dist. LEXIS 20786 at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food,* 679 F.2d at 1354). Although the FLSA places "limits on an employee's ability to waive claims . . . for fear that employers would [otherwise] coerce employees into settlement and waiver," *Wolinsky*, 900 F. Supp. 2d at 335 (alteration in original) (internal quotation marks omitted), "these concerns are not as relevant when the plaintiffs no longer work for the defendant, as is the case here." *Cisneros v. Schnipper Restaurant LLC*, No. 13-cv-6266, 2014 U.S. Dist. LEXIS 2111, *3 (S.D.N.Y. Jan. 8, 2014).

Here, there is no question that the settlement did not come about because of "overreaching" by the employer. To the contrary, the settlement was the result of vigorous arm's-length negotiations, including three (3) mediation sessions with Richard Leland of the SDNY Mediation Program. The parties are represented by counsel experienced in wage and hour law who duly counseled their respective clients on the benefits and risks of continued litigation. The negotiated settlement is fair and reasonable when considered in the context of the litigation risks faced by Plaintiffs and the risk that recovery after trial would be less than the negotiated settlement amount. Settlement at this stage of the case unquestionably constitutes the most efficient and effective conclusion to this litigation. Defendants asserted legitimate substantive defenses which highlighted substantial risk to Plaintiffs' ability to continue this FLSA litigation. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (FLSA protects only minimum wage and overtime). Arm's-length negotiations between knowledgeable counsel followed, culminating in a negotiated resolution with the assistance of a Court-assigned mediator.

\* \* \* \* \*

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the settlement is completely fair, reasonable, and adequate to the Plaintiffs and respectfully request that the Court approve the Agreement.

We appreciate Your Honor's attention to this matter. Please contact the undersigned counsel for the parties should you have any questions regarding this submission.

Respectfully submitted,

| **PELTON GRAHAM LLC** | **GREENBERG TRAURIG, LLP** |
|---|---|
| By: */s/ Brent E. Pelton, Esq.* | By: */s/ Jerrold F. Goldberg, Esq.* |
| Brent E. Pelton, Esq. | Jerrold F. Goldberg, Esq. |
| Kristen E. Boysen, Esq. | Nicholas A. Corsano, Esq. |

| | |
|---|---|
| 111 Broadway, Suite 1503<br>New York, New York 10006<br>Tel.: (212) 385-9700<br><br>*Attorneys for Plaintiffs* | 200 Park Avenue<br>New York, New York 10166<br>Tel: (212) 801-9209<br><br>*Attorneys for Defendants* |